IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KENNETH D. SHEDDEN,            :
                               :
        Plaintiff              :    CIVIL NO. 4:10-CV-2515
                               :
    vs.                        :
                               :
MICHAEL J. ASTRUE,             :
COMMISSIONER OF SOCIAL         :    (Judge Rambo)
SECURITY,                      :
                               :
        Defendant              :

MEMORANDUM AND ORDER

## Background

The captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Kenneth D. Shedden's claim for supplemental security income benefits. For the reasons set forth below we will remand the case to the Commissioner for further proceedings.

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income.

Shedden was born in the United States on October 18, 1965. Tr. 80.[1]  Shedden has a limited education. Tr. 53.  He withdrew from school after completing the 10th grade in 1981. Id.  Shedden in documents filed with the Social Security Administration stated that he can read, write, speak and understand the English language and he testified at the administrative hearing held in this case that he can perform basic mathematical functions. Tr. 38 & 95.  However, Shedden also testified that he is "[n]ot very good" at reading and writing the English language. Tr. 38.  During his elementary and secondary schooling, he attended regular education classes. Tr. 53.

Shedden held two jobs which can be considered past relevant employment.[2]  Shedden worked as a grader operator for a township for 5 years and as a landscaper

_____

1.  References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of his Answer on February 22, 2011.

2.  Past relevant employment in the present case means work performed by Shedden during the 15 years prior to the date his claim for supplemental security income benefits was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

at a stone quarry for 12 years. Tr. 53, 97 & 104.   The
position as a grader operator was described by a
vocational expert as semi-skilled, heavy work as
actually performed by Shedden and as semi-skilled, light
work as generally performed in the economy. Id.   The
landscaping position was described as unskilled, heavy
work.[3] Id.

_____

3.  The terms sedentary, light and medium work are
defined in the Social Security regulations as follows:

> (a) *Sedentary work*. Sedentary work involves
> lifting no more than 10 pounds at a time and
> occasionally lifting or carrying articles like
> docket files, ledgers, and small tools.
> Although a sedentary job is defined as one
> which involves sitting, a certain amount of
> walking and standing is often necessary in
> carrying out job duties.  Jobs are sedentary if
> walking and standing are required occasionally
> and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no
> more than 20 pounds at a time with frequent
> lifting or carrying of objects weighing up to
> 10 pounds.  Even though the weight lifted maybe
> very little, a job is in this category when it
> requires a good deal of walking or standing, or
> when it involves sitting most of the time with
> some pushing and pulling of arm or leg
> controls.  To be considered capable of
> performing a full or wide range of light work,
> you must have the ability to do substantially
> all of these activities.  If someone can do
> light work, we determine that he or she can

(continued...)

3

Shedden had employment and earnings in 1985, 1986, 1988 through 1996, 1999 and 2007. Tr. 85.  No earnings are reported for the years 1987, 1997, 1998 and 2000 through 2006. <u>Id.</u>  Shedden's earnings in 2007 were $8567.00. <u>Id.</u>  Shedden's total reported earnings are $93,225.36.  Shedden's last work was as a landscaper. Tr. 97.  Shedden has no reported work or earnings since December 1, 2007. Tr. 96.

---

3.   (...continued)
         also do sedentary work, unless there are
         additional limiting factors such as loss of
         fine dexterity or inability to sit for long
         periods of time.

         (c) *Medium work*.  Medium work involves lifting
         no more than 50 pounds at a time with frequent
         lifting or carrying of objects weighing up to
         25 pounds.  If someone can do medium work, we
         determine that he or she can do sedentary and
         light work.

         (d) *Heavy work*.  Heavy work involves lifting no
         more than 100 pounds at a time with frequent
         lifting or carrying of objects weighing up to
         50 pounds. If someone can do heavy work, we
         determine that he or she can also do medium,
         light, and sedentary work.

20 C.F.R. § 416.967.

On May 21, 2008, Shedden protectively filed[4] an application for supplemental security income benefits. Tr. 18, 28, 38 & 91.   Shedden claims that he became disabled on December 1, 2007, because of an injury to his back and neck which he sustained when he fell into a collapsed sewer pipe.[5] Tr. 96, 143, 170, 197 & 262. Shedden claims he suffers from pain in his neck, back and right leg, numb fingers and hands, headaches, shoulder pain/stiffness, a sleeping disorder, diabetes and depression. Tr. 39-40, 125 & 131.   He contends he has difficulty lifting, bending, standing, walking and sitting because of pain and weakness.   Tr. 39-45, 116, 119 & 128.

Shedden lives in a one-story house with his girlfriend and her two children, ages 6 and 9. Tr. 48. Shedden went to watch the youngest play football on one

_____

4.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

5.  The fall is inconsistently reported to have occurred on Shedden's property and also on a neighbor's property.

occasion. Tr. 49. Shedden's activity during the day is primarily watching TV. Tr. 48.  However, he also reads books and magazines and plays board games with the children. Tr. 111-112.  Shedden also has a daughter who is ten years of age and visits him occasionally. Tr. 49. Shedden went on one occasion to see his daughter engage in competitive swimming. Id.  Shedden uses a cane to ambulate which was prescribed by his primary care physician. Tr. 43. He testified that he can only sit or stand for twenty minutes at a time. Id.  His girlfriend does the cooking and most of the household chores and when they go shopping he stays in the car. Id.; Tr. 48-49 & 113. He stated he goes shopping once per month. Tr. 114.  He is able to take care of most personal care matters, such as showering. Id.  However, sometimes he needs assistance putting on his socks and shoes. Tr. 49. He rarely lifts any items. Tr. 43.  He stated that he could lift a gallon of milk and a two liter bottle of soda. Id.  His girlfriend "brings the groceries in, and the kids and everything." Id.  His girlfriend organizes his medications. Tr. 45.  Shedden gets up at about 7:00

a.m. and goes to bed at about 10:00 p.m. Tr. 49.  He

testified that he has difficulty sleeping at night and

that during the day he takes a 1 ½ to 2 hour nap. Tr.

51-52.

Shedden's alleged disability onset date of

December 1, 2007, has no impact on Shedden's application

for supplemental security income benefits because

supplemental security income is a needs based program

and benefits may not be paid for "any period that

precedes the first month following the date on which an

application is filed or, if later, the first month

following the date all conditions for eligibility are

met." See C.F.R. § 416.501.  Consequently, Shedden is

not eligible for SSI benefits for any period prior to

June 1, 2008.

On July 24, 2008, the Bureau of Disability

Determination[6] denied Shedden's application. Tr. 60-64.

On August 25, 2008, Shedden requested a hearing before

_____

6.  The Bureau of Disability Determination is an
agency of the Commonwealth of Pennsylvania which
initially evaluates applications for supplemental
security income benefits on behalf of the Social
Security Administration. Tr. 60.

an administrative law judge. Tr. 65.  After approximately sixteen months, a hearing was held before an administrative law judge on December 11, 2009. Tr. 32-57.  On January 22, 2010, the administrative law judge issued a decision denying Shedden's application for benefits. Tr. 18-28.  On March 5, 2010, Shedden filed a request for review of the administrative law judge's decision with the Appeals Council of the Social Security Administration. Tr. 13.  The Appeals Council on December 2, 2010, concluded that there was no basis upon which to grant Shedden's request for review. Tr. 1-4. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

On December 10, 2010, Shedden filed a complaint in this court requesting that we reverse the decision of the Commissioner and award him benefits, or in the alternative, remand the case to the Commissioner for further proceedings.

The Commissioner filed an answer to the complaint and a copy of the administrative record on February 22, 2011.  Shedden filed his brief on May 8,

2011, and the Commissioner filed his brief on June 9,
2011.  The appeal[7] became ripe for disposition on June
27, 2011, when Shedden elected not to file a reply
brief.

## STANDARD OF REVIEW

When considering a social security appeal, we
have plenary review of all legal issues decided by the
Commissioner.  See Poulos v. Comm'r of Soc. Sec., 474
F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Comm'r of Soc.
Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999);
Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir.
1995).  However, our review of the Commissioner's
findings of fact pursuant to 42 U.S.C. § 405(g) is to
determine whether those findings are supported by
"substantial evidence."  Id.; Brown v. Bowen, 845 F.2d
1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d
1058, 1064 (3d Cir. 1993).  Factual findings which are
supported by substantial evidence must be upheld. 42

---

7. Under the Local Rules of Court "[a] civil action
brought to review a decision of the Social Security
Administration denying a claim for social security
disability benefits" is "adjudicated as an appeal."
M.D.Pa. Local Rule 83.40.1.

U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38

(3d Cir. 2001)("Where the ALJ's findings of fact are

supported by substantial evidence, we are bound by those

findings, even if we would have decided the factual

inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700,

704 (3d Cir. 1981)("Findings of fact by the Secretary

must be accepted as conclusive by a reviewing court if

supported by substantial evidence."); <u>Keefe v. Shalala</u>,

71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270

F.3d 171, 176 (4th Cir. 2001); <u>Martin v. Sullivan</u>, 894

F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or

considerable amount of evidence, but 'rather such

relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.' " <u>Pierce v.

Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated

Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938));

<u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d

Cir. 2008); <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d

Cir. 1999). Substantial evidence has been described as

more than a mere scintilla of evidence but less than a

preponderance. <u>Brown</u>, 845 F.2d at 1213. In an

adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the

decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

Another critical requirement is that the Commissioner adequately develop the record. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)("The ALJ has an obligation to develop the record in light of the non-adversarial nature of benefits proceedings, regardless of whether the claimant is represented by counsel."); Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Fraction v. Bowen, 787 F.2d 451, 454 (8th Cir. 1986); Reed v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001); Smith v. Apfel, 231 F.3d 433. 437 (7th Cir. 2000); see also Sims v. Apfel, 530 U.S. 103, 111 (2000)("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). If the record is not adequately developed, remand for further proceedings is appropriate.  Id.

**SEQUENTIAL EVALUATION PROCESS**

12

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating supplemental security income claims.  See 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[8] (2) has an impairment that is severe or a combination of impairments that is severe,[9] (3) has an impairment or combination of

_____

8.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 416.910.

9.  The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent
(continued...)

14

impairments that meets or equals the requirements of a listed impairment,[10] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

_____

9.  (...continued)
steps of the sequential evaluation process.  20 C.F.R. §§ 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 416.945(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 416.945(c).

10.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

11.  If the claimant has the residual functional
(continued...)

15

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. <u>Id</u>; 20 C.F.R. § 416.945; <u>Hartranft</u>, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**<u>MEDICAL RECORDS</u>**

Before discussing the administrative law judge's decision and the arguments of counsel, the court will review some of Shedden's medical records.

---

11. (...continued)
capacity to do his or her past relevant work, the claimant is not disabled.

16

The first relevant medical record is from December 1, 2007, the date Shedden allegedly fell in the collapsed sewer pipe.  After that fall Shedden visited the emergency department at the Robert Packer Hospital, Sayre, Pennsylvania. Tr. 143-152.  The medical record of that visit reveals that Shedden complained of "bilateral frontal headache with blurring vision," "tingling all over the right thigh," "soreness in the neck," "mild right shoulder pain," and "low backache." Tr. 143.

A CT scan of Shedden's cervical spine revealed "a minimal left paracentral disc bulge at C2-C3" and "degenerative changes . . . at C5-C6 and C6-C7." Tr. 145.  A CT scan of the lumbar spine revealed "a moderate right paracentral disc protrusion at L4-L5 level" and "some extrinsic pressure on the ventral aspect of the thecal sac[12] and extrinsic pressure on the L5 nerve

_____

12.  The thecal sac is an elongated tube that extends from the brain to the end of the spine in which the spinal cord and nerve roots run. It is a covering (membrane) that surrounds the spinal cord and contains cerebral spinal fluid. Herniated discs which impinge the thecal sac may or may not cause pain symptoms.

root."[13] <u>Id.</u>  During his stay in the emergency

---

13.  Discogenic disease or degenerative disc desease is
disease or degeneration of the intervertebral discs.
The intervertebral discs, the soft cushions between the
24 bony vertebral bodies, have a tough outer layer and
an inner core composed of a gelatin-like substance, the
nucleus pulposus. The outer layer of an intervertebral
disc is called the annulus fibrosus. A bulge
(protrusion) is where the annulus of disc extends
beyond the perimeter of the vertebral bodies. A
herniation is where the nucleus pulposus goes beyond
its normal boundary into the annulus and presses the
annulus outward. Such bulges(protrusions) and
herniations if they contact nerve tissue can cause
pain.  Degenerative disc disease (discogenic disease)
has been described as follows:

> As we age, the water and protein
> content of the cartilage of the body
> changes. This change results in
> weaker, more fragile and thin
> cartilage. Because both the discs and
> the joints that stack the vertebrae
> (facet joints) are partly composed of
> cartilage, these areas are subject to
> wear and tear over time (degenerative
> changes). The gradual deterioration of
> the disc between the vertebrae is
> referred to as degenerative disc
> disease. . . Wear of the facet
> cartilage and the bony changes of the
> adjacent joint is referred to as
> degenerative facet joint disease or
> osteoarthritis of the spine. Trauma
> injury to the spine can also lead to
> degenerative disc disease.

(continued...)

18

_____

13.   (...continued)
         Degeneration of the disc is medically
         referred to as spondylosis.
         Spondylosis can be noted on x-ray
         tests or MRI scanning of the spine as
         a narrowing of the normal "disc space"
         between the adjacent vertebrae.

         Degeneration of the disc tissue makes
         the disc more susceptible to
         herniation. Degeneration of the disc
         can cause local pain in the affected
         area. Any level of the spine can be
         affected by disc degeneration. When
         disc degeneration affects the spine of
         the neck, it is referred to as
         cervical disc disease. When the mid-
         back is affected, the condition is
         referred to as thoracic disc disease.
         Disc degeneration that affects the
         lumbar spine can cause chronic low
         back pain (referred to as  lumbago) or
         irritation of a spinal nerve to cause
         pain radiating down the leg
         (sciatica). Lumbago causes pain
         localized to the low back and is
         common in older people. Degenerative
         arthritis (osteoarthritis) of the
         facet joints is also a cause of
         localized lumbar pain that can be
         detected with plain x-ray testing is
         also a cause of localized lumbar pain.
         The pain from degenerative disc
         disease of the spine is usually
         treated conservatively with
         intermittent heat, rest,
         rehabilitative exercises, and

(continued...)

department Shedden was given intravenously the narcotic pain reliever Dilaud. Id. After being examined by at least three physicians it was determined that Shedden could be discharged from the hospital with instructions to follow-up with his primary care physician. Tr. 144. The diagnoses was that Shedden suffered from "low backache with tingling sensation in the right thigh" and "chronic disc degenerative changes in the lumbar spine." Id.

On December 7, 2007, Shedden had an appointment with his primary care physician, Frederick L. Teribury, Jr., M.D., in Sayre. Tr. 161.  Dr. Teribury's notes of this appointment are only partially legible. However, we can discern that Shedden complained of lower back pain, neck pain, migraine headaches, and a sore shoulder. Id.

---

13.  (...continued)
     medications to relieve pain, muscle
     spasms, and inflammation.

William C. Shiel, Jr., M.D., Degenerative Disc Disease and Sciatica, MedicineNet.com, http://www.medicinenet. com/degenerativedisc/page2.htm (Last accessed February 21, 2012).  Degenerative disc disease is considered part of the normal aging process. Id.

Dr. Teribury ordered an MRI and recommended that Shedden consult with a neurosurgeon. Id.  He further instructed Shedden to engage in no manual or physical labor until his evaluation was complete. Id.

On December 10, 2007, Shedden had an MRI of the cervical spine which revealed the following: (1) "diffuse disc bulging, discogenic disease and spondylosis from the C4-C5 through the C6-C7 levels," (2) "moderate bilateral foraminal stenosis[14] at the C6-C7 level," (3) "moderate right foraminal stenosis at the C5-C6 level," (4) "a kyphotic hyperangulation"[15] at the C4-C5 level, and (5) "no herniated discs." Tr. 153.

Also, on December 10, 2007, Shedden had an MRI of the lumbar spine and the sacrum. Tr. 154-155.

---

14. Foraminal stenosis is the narrowing of the opening through which nerve roots exit.  The nerve roots are branches of the spinal cord. They carry signals to the rest of the body at each level along the spine.

15. Kyphosis is defined as "abnormally increased convexity in the curvature of the thoracic spine as viewed from the side; hunchback." Dorland's Illustrated Medical Dictionary, 886 (27th Ed. 1988); Kyphotic is defined as "affected with or pertaining to kyphosis." Id.

The MRI of the lumbar spine revealed the following: (1) "a large diffuse disc bulge, discogenic disease and spondylosis at the L4-L5 a superimposed right-sided paramedian disc herniation with a component migrating superiorly from this level impressing the right ventral thecal sac and causing some L5 nerve root impression prior to its exit from the thecal sac. There is also a right lateral component impressing the L4 spinal nerve with mild right foraminal stenosis,"[16] and (2) "[d]isc bulging at L2-L3, L3-L4 and L5-S1 levels." Tr. 154.

The MRI of the sacrum revealed the following: "some arthrosis of the sacral coccygeal synchrondoses between the fifth sacrum and the first coccygeal segment

_____

16. This report indicates that both the L4 and L5 nerve roots were impacted.

and between the first and second coccygeal segments."[17]
Tr. 155.

Based on a referral from Dr. Teribury, Shedden
on January 21, 2008, was evaluated by Saeed A. Bajwa,
M.D., a neurosurgeon. Tr. 157-159.  Dr. Bajwa's
examination of Shedden's spine revealed moderate
paraspinal muscle[18] spasms and tenderness in the lower
lumbosacral region, restricted range of motion in
lumbosacral spine, and a positive straight leg raising
test on the right.[19] Tr. 158. There also was increased

---

17. The cervical(7), thoracic (12) and lumbar(5) region
of the spine is made up of 24 vertebrae. The lower
spine consists of the sacrum and the coccyx (the
tailbone). The sacrum and coccyx are made up of nine
fused vertebrae. Arthrosis has two meanings.  It is
defined both as a joint and a disease or degeneration
of a joint. This report suggests that there was some
degeneration (arthosis) at the junction of the sacrum
and coccyx.

18.  Paraspinal muscles are muscles that run essentially
parallel to the spine.

19.  The straight leg raise test is done to determine
whether a patient with low back pain has an underlying
herniated disc.  The patient, either lying or sitting
with the knee straight, has his or her leg lifted.  The
test is positive if pain is produced between 30 and 70

(continued...)

sensitivity to pain (hyperalgesia) over the right L5
dermatone.[20] <u>Id.</u> Dr. Bajwa reviewed Shedden's MRI scans
and stated that they "showed evidence of diffuse disc
bulge at L4-5 with facet disease and spondylosis at L4-5
moreso on the right than the left . . . causing
compression of the thecal sac and right moreso than left
L5 nerve root." <u>Id.</u> Dr. Bajwa's assessment was that
Shedden suffered from "severe low back pain with right
L5 radiculitis,"[21] "neck pain with some headaches mostly

---

19.  (...continued)
degrees. Niccola V. Hawkinson, DNP, RN, Testing for
Herniated Discs: Straight Leg Raise, SpineUniverse,
http://www.spineuniverse.com/experts/testing-herniated
-discs-straight-leg-raise (Last accessed February 21,
2012).

20.  A dermatone is an area of the skin mainly supplied
by a single spinal nerve, There are 8 such cervical
nerves, 12 thoracic, 5 lumbar and 5 sacral. A problem
with a particular nerve root should correspond with a
sensory defect, muscle weakness, etc., at the
appropriate dermatone. <u>See</u> Stephen Kishner, M.D.,
Dermatones Anatomy, Medscape Reference, http://
emedicine.medscape.com/article/1878388-overview (Last
accessed February 21, 2012).

21.  Radiculitis is "inflamation of the root of a spinal
nerve, especially of that portion of the root which
lies between the spinal cord and the intervertebral
                                            (continued...)

24

muscular in nature," and a "[m]oderately large herniated

lumbar disc at L4-5, right moreso than left along with

facet arthropathy."[22] Tr. 159.  Dr. Bajwa prescribed the

_____

21.  (...continued)
canal." Dorland's Illustrated Medical Dictionary, 1405
(27th Ed. 1988). Radiculitis is synonymous with
radiculopathy which is "characterized by pain which
seems to radiate from the spine" to other parts of the
body, including the extremities. Radiculopathy is a
condition where one or more nerves or nerve roots are
affected and do not work properly. Radiculopathy is a
result of disc herniation or an injury causing
foraminal impingement of an exiting nerve (the
narrowing of the channel through which a nerve root
passes). See generally, Radiculopathy,
MedicineNet.com,http://www.medicinenet.com/radiculopath
y/article.htm (Last accessed February 21, 2012). A
herniated disc is one cause of radiculopathy. Id.
Radiculopathy is a step beyond degenerative disc
disease. Radiculopathy can cause tingling, numbness and
weakness in an extremity.

22.  "The facet joints connect the posterior elements of
the [vertebrae] to one another. Like the bones that
form other joints in the human body, such as the hip,
knee or elbow, the articular surfaces of the facet
joints are covered by a layer of smooth cartilage,
surrounded by a strong capsule of ligaments, and
lubricated by synovial fluid. Just like the hip and the
knee, the facet joints can also become arthritic and
painful, and they can be a source of back pain.  The
pain and discomfort that is caused by degeneration and
arthritis of this part of the spine is called facet
arthropathy, which simply means a disease or

(continued...)

drugs Decadron,[23] Skelaxin[24] and Norco[25] and referred
Shedden to physical therapy. Id.

On March 25, 2008, Shedden had a follow-up
appointment with Dr. Bajwa.[26] Tr. 156.  At that
appointment Shedden reported that he had "persistent
back and neck pain" with radiation of the pain "down

_____

22.  (...continued)
abnormality of the facet joints." Facet Arthropathy,
Back.com, http://www.back.com/causes-mechanical-facet
.html (Last accessed February 21, 2012). The facet
joints are in the back of the spine and act like
hinges, There are two superior (top) and two inferior
(bottom) portions to each facet joint called the
superior and inferior articular processes.

23.  Decadron, is a corticosteroid "used to treat severe
inflammation." Decadron, Drugs.com, http://www.drugs.
com/cdi/decadron.html (Last accessed February 22,
2012).

24.  Skelaxin is a drug that blocks nerve impulses or
pain sensations in the brain to help relax muscles.
Skelaxin, Drugs.com, http://www.drugs.com/skelaxin.html
(Last accessed February 22, 2012).

25.  Norco, a narcotic pain reliever, is a combination
of acetaminophen and hydrocodone. Norco, Drugs.com,
http://www.drugs.com/norco.html (Last accessed February
22, 2012).

26.  It is not clear whether Shedden was actually seen
by Dr. Bajwa or only by a physician's assistant.

both buttocks and into the right foot." Tr. 156.  It was noted in the report of this appointment that Shedden had three physical therapy sessions at Robert Packer Hospital and that those sessions aggravated his pain. Id.  The assessment of Shedden's condition was essentially the same as found on January 21, 2008. Id. It was noted that Shedden continued to suffer from a "[herniated nucleus pulposus], right L4-5 with facet arthropathy with right L5 radiculitis" and "[n]eck pain with cephalgia [headache], likely mechanical." Id. Shedden was referred to a different physical therapy program and it was stated that if that failed Shedden "may benefit from epidural block at L4-L5" and that "[s]urgery [was] the last resort." Id.  A follow-up appointment was scheduled in six weeks. Id.  A copy of the report of this appointment was sent to Dr. Teribury. Id.

At a physical therapy appointment on April 9, 2008, Shedden reported that he had headaches four times per week, he had cervical and lumbar pain, right lower

27

extremity pain and paresthesias[27] in the fingers. Tr.
170-171.  At this appointment he had a positive straight
leg raise test on the right. Tr. 172.

At a physical therapy appointment on May 7,
2008, Shedden "complain[ed] of lumbosacral pain,
thoracic pain, bilateral leg pain below knees" and
"headaches several times a week."[28] Tr. 165.

Shedden had an appointment at Dr. Bajwa's office
on May 9, 2008, at which he complained that the physical
therapy sessions were causing pain and stated that he
was against surgery. Tr. 249.  The report of this

---

27.  Paresthesia is a sensation of tingling, prickling,
or numbness of the skin, more generally known as the
feeling of pins and needles. See Dorland's Illustrated
Medical Dictionary, 1232 (27th Ed. 1988).

28.  Shedden at the administrative hearing testified
about recurrent headaches. The administrative law judge
in his decision which will be addressed *infra*
discredited Shedden's testimony about those recurrent
headaches because Shedden made "no such complaints to
Dr. Teribury at any time."  Tr. 23. We assume that Dr.
Teribury, the primary care physician, was privy to the
physical therapy records. Furthermore, many of Dr.
Teribury's treatment notes are illegible.  The apparent
absence of such reports does not mean that Shedden did
not complain of headaches to Dr. Teribury.

appointment states that Shedden "remain[ed] quite symptomatic with right L5 radiculitis." Id.  Shedden was scheduled for "an epidural block at L4-L5" and continued on the "prescriptions for Naprosyn[29] and Norco" and given a five day supply of Decadron. Id.  A copy of the report of this appointment was sent to Dr. Teribury. Id.

On June 9, 2008, Shedden had an appointment with Dr. Teribury complaining of neck and lower back pain. Tr. 160. The notes of this appointment are only partially legible and we will not attempt to decipher them.

On June 13, 2008, Dr. Teribury completed an employability assessment form on behalf of Shedden. Tr. 173-174.  In that form Dr. Teribury stated that Shedden was temporarily disabled from any gainful employment for more than 12 months from December 7, 2007, with the disability expected to last until August, 2009. Id.  Dr.

--------

29.  Naprosyn (brand names include Aleve) is a nonsteroidal anti-inflammatory drug which works by reducing inflammation and pain. Naprosyn, Drugs.com, http://www.drugs.com/naprosyn.html (Last accessed February 22, 2012).

Teribury stated that Shedden's diagnosis was lumbar and cervical trauma and that his assessment was based on physical examinations, review of medical records, clinical history and appropriate tests and diagnostic procedures. <u>Id.</u>

On June 9, 2008, Shedden had an appointment with Dr. Bajwa at which Shedden complained of neck pain and "pain in the right lower back going into the buttocks and right leg. Tr. 250. Dr. Bajwa noted significant restriction in lumbosacral range of motion, a positive straight leg raise test on the right, and moderately severe paraspinal muscle spasm. <u>Id.</u> Dr. Bajwa's assessment was that Shedden suffered from "[s]evere low back pain with right moreso than left radiculitis, secondary to large diffuse disc bulge at L4-5" and "neck pain secondary to cervical spondylosis." <u>Id.</u> A copy of the report of this appointment was sent to Dr. Teribury. <u>Id.</u>

On August 11, 2008, Shedden had an appointment with Dr. Teribury. Tr. 225.  The notes of this

appointment are only partially legible.  It appears that Shedden was having a problem with his blood sugar.  Id. A blood chemistry conducted on August 13, 2008, indicates that Shedden's blood sugar was elevated at 375 mg/dl. Tr. 222. The normal range on the laboratory report was stated to be 70 to 110 mg/dl. Id.  Also, Shedden's glycohemoglobin blood test(HgA1C) was elevated at 10.1.[30] Id.  The normal range on the laboratory report

─────────────────────

30.  The A1C blood test is a test that measures the amount of glycated hemoglobin or glycohemoglobin in the blood.  It is used to monitor the control of diabetes mellitus.  Glycohemoglobin is hemoglobin to which glucose is bound.  Glucose stays attached to hemoglobin for the life of the red blood cells, 120 days.  A1C reflects the average blood glucose and gives a good estimate of how well an individual manages his or her diabetes over the prior 2 to 3 months.  The normal A1C level is 7% according to the American Diabetes Association and 6.5% according to the American Association of Clinical Endocrinologists.  An A1C level of 10% translates to an estimated average glucose of 240. American Diabetes Association, Estimated Average Glucose, http://www.diabetes.org/living-with-diabetes/treatment-and-care/blood-glucose-control/estimated-average-glucose.html (Last accessed February 22, 2012). Normal fasting blood glucose is 70-99 and normal blood glucose 2 hours after eating is 70-145. Diabetes Health Center, Blood Glucose, WebMd, http://diabetes.webmd.com/blood-glucose?page=3 (Last accessed February

(continued...)

was specified to be 3.9 to 6.4. Id. Shedden's blood lipid levels were also elevated: Cholesterol was at 289 mg/dl (normal range 118 to 200) and triglycerides was at 1251 mg/dl (normal range 10-150). Tr. 223.

On August 18, 2008, Dr. Teribury started Shedden on the cholesterol and triglyceride reducing drug Tricor[31] and on August 20, 2008, on the drug Duetact, to help control his blood sugar levels.[32] Tr. 221. Also, Dr. Teribury prescribed the antidepressant drug Zoloft.[33] Id.

---

30. (...continued)
22, 2012).

31. TriCor, Drugs.com, http://www.drugs.com/tricor.html (Last accessed February 22, 2012).

32. "Duetact contains a combination of glimepiride and pioglitazone, two oral diabetes medicines that help control blood sugar levels. Duetact is for people with type 2 diabetes who do not use daily insulin injections." Duetact, Drugs.com, http://www.drugs. com/duetact.html (Last accessed February 22, 2012).

33. Zoloft, Drugs.com, http://www.drugs.com/zoloft.html (Last accessed February 22, 2012).

On February 26, 2009, Shedden had an appointment
with Dr. Teribury at which he stated that Percocet[34] was
not helping his pain and he was having more headaches.
Tr. 226.  The note of this appointment is only partially
legible.

On May 28, 2009, Shedden had an appointment with
Dr. Teribury at which Shedden complained that his hands
were hurting and he had ankle and shoulder pain. Tr.
227. An examination of Shedden's extremities revealed
"severe pain [with] palpation[.]" Id.  It also appears
that Dr. Teribury diagnosed Shedden as having type 2
diabetes mellitus and prescribed a medication for that
condition. Id.  The notes of the appointment are only
partially legible.

The results of blood tests performed on June 3,
2009, reveal that Shedden's blood sugar and lipid levels
had improved. Tr. 228-230.

_____

34.  Percocet, a combination of oxycodone and
acetaminophen, is a narcotic pain reliever. Percocet,
Drugs.com, http://www.drugs.com/percocet.html (Last
accessed February 22, 2012).

On September 14 and October 5, 2005, Shedden had appointments with Dr. Teribury. Tr. 194 and 234. The notes of these appointments are only partially legible and we will not attempt to decipher them.

On October 22, 2009, Shedden had an appointment with Dr. Teribury at which Shedden complained of back pain. Tr. 188-189. Dr. Teribury noted spinal tenderness, abnormal lumbar spine range of motion and severe "sciatica" pain. Id. On November 3, 2009, Dr. Teribury prescribed a rolling walker for Shedden. Tr. 190.

On December 3, 2009, Shedden had an appointment with Dr. Teribury at which Shedden complained of back, neck and joint pain. Tr. 185-187. Dr. Teribury noted abnormal cervical range of motion, abnormal coordination of body movements and flaccid upper extremity muscles. Id.

On December 15, 2008, Dr. Shedden issued a letter which states in part as follows: "Mr. Shedden has suffered a significant spinal injury which has caused a

34

degradation of his overall condition.  The upper and lower extremities ranges of motion are not affected mechanically.  The limitation is directly associated with the neck and back and any movement and stress associated with the spinal column." Tr. 196.

On March 14, 2010, after the administrative law judge issued his decision, Dr. Teribury completed a medical source statement of Shedden's ability to do work-related physical activities. Tr. 253-260.  In that document Dr. Teribury limited Shedden to less than the physical requirements of full-time sedentary work. Tr. 255-256.

There is no assessment of Shedden's physical exertional abilities, i.e., his ability to sit, stand walk, carry, lift, etc., contained within the administrative record from a physician who reviewed the medical records on behalf of the Bureau of Disability Determination.  In fact there is no indication that a physician contracted by the Bureau of Disability Determination either reviewed Shedden's medial records

35

or examined Shedden.  There is only a physical residual functional capacity assessment from Theresa M. McDermott,  a non-medical disability examiner/ adjudicator. Tr. 59 and 175-179.  Ms. McDermott concluded that Shedden could engage in the full-range of light work. Id.

## DISCUSSION

The administrative law judge at step one of the sequential evaluation process found that Shedden did not engage in substantial gainful work activity since May 21, 2008, the application date. Tr. 20.

At step two of the sequential evaluation process, the administrative law judge found that Shedden had the following severe impairments: "degenerative disc disease and obesity." Tr. 20.

At step three of the sequential evaluation process the administrative law judge found that Shedden's impairments did not individually or in combination meet or equal a listed impairment. Tr. 22.

        At step four of the sequential evaluation
process the administrative law judge found that Shedden
could not perform his past relevant heavy work but
Shedden had the residual functional capacity to perform
a limited range of light work as defined in the
regulations. Tr. 22.  Specifically, the administrative
law judge found that Shedden could perform light work
"except that claimant requires a sit/stand option, and
light work involving occasional climbing, balancing,
stooping, and bending, but no crawling or kneeling." Id.
In so finding, the administrative law judge rejected the
opinion of Dr. Teribury dated June 13, 2008, that
Shedden was temporarily disabled from any gainful
employment for more than 12 months beginning on December
7, 2007.  The administrative law judge did not point to
any medical opinion contrary to the opinion of Dr.
Teribury and supportive of the finding that Shedden
could engage in light work.

        At step five, the administrative law judge based
on a residual functional capacity of a limited range of

37

light work as described above and the testimony of a
vocational expert found that Shedden had the ability to
perform work as a guard and door keeper and a ticket
taker, and that there were a significant number of such
jobs in the regional, state and national economies. Tr.
27.

The administrative record in this case is 264
pages, which the court has thoroughly reviewed. Shedden
argues, inter alia, that the administrative law judge
erred when he failed to (1) properly consider Dr.
Teribury's disability opinion and (2) adequately develop
the record. Those arguments have substantial merit. In
addition to those errors, the administrative law judge
erred at step two of the sequential evaluation process.
We will begin with that error.

The Social Security regulations contemplate the
administrative law judge, when considering whether there
are any medically determinable impairments and then when
setting a claimant's residual functional capacity,
consider the symptoms of both medically determinable

severe and non-severe impairments. 20 C.F.R. § 404.1529.
The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation
process, is a threshold test. 20 C.F.R. § 404.1520(c).
If a claimant has no impairment or combination of
impairments which significantly limit the claimant's
physical or mental abilities to perform basic work
activities, the claimant is "not disabled" and the
evaluation process ends at step two. Id.  If a claimant
has any severe impairments, the evaluation process
continues.  20 C.F.R. § 404.1520(d)-(g).  A failure to
find a medical condition severe at step two will not
render a decision defective if some other medical
condition was found severe at step two.  However, all of
the medically determinable impairments both severe and
non-severe must be considered at step two and then at
step four when setting the residual functional capacity.
The social security regulations mandate such
consideration and this court has repeatedly so
indicated. See, e.g., Christenson v. Astrue, Civil No.

10-1192, slip op. at 12 (M.D. Pa. May 18, 2011)(Muir, J.); Little v. Astrue, Civil No. 10-1626, slip op. at 19-21 (M.D.Pa. September 14, 2011)(Kosik, J.); Crayton v. Astrue, Civil No. 10-1265, slip op. at 32-35 (M.D.Pa. September 27, 2011)(Caputo, J.); 20 C.F.R. §§ 416.923 and 416.945(a)(2).[35]

The record indicates that in addition to degenerative disc disease Shedden was diagnosed on several occasions with radiculopathy in the right lower extremity. The failure of the administrative law judge to find that condition as a medically determinable impairment, or to give an adequate explanation for

_____

35. The Social Security Administration has a policy of nonacquiescence, i.e., the policy of not following precedents set by both District Courts and Courts of Appeals other than with respect to the claimant named in a particular decision. See Office of Hearings and Appeals Handbook, § 1-161, quoted in Stieberger v. Heckler, 615 F.Supp. 1315 (S.D. N.Y. 1985), vacated, 801 F.2d 29 (2d Cir. 1986)("[W]here a district court or circuit court[']s decision contains interpretations of the law, regulations, or rulings [that] are inconsistent with the Secretary's interpretations, the [administrative law judges] should not consider such decisions binding on future cases simply because the case is not appealed.").

discounting it, makes his decisions at steps two and four of the sequential evaluation process defective.

The error at step two of the sequential evaluation process draws into question the administrative law judge's residual functional capacity determination and assessment of the credibility of Shedden. The administrative law judge found that Shedden's medically determinable impairments could reasonably cause Shedden's alleged symptoms but that Shedden's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible. This determination by the administrative law judge was based on an incomplete and faulty analysis of all of Shedden's medically determinable impairments. The error at step two is a sufficient basis to remand this case to the Commissioner for further proceedings. However, there are several other errors that support such a remand.

The administrative law judge rejected the opinion of Dr. Teribury, a treating physician, regarding

the ability of Shedden to engage in work.  The
preference for the treating physician's opinion has been
recognized by the Court of Appeals for the Third Circuit
and by all of the federal circuits. <u>See</u>, <u>e.g.</u>, <u>Morales
v. Apfel</u>, 225 F.3d 310, 316-18 (3d Cir. 2000).  When the
treating physician's opinion conflicts with a non-
treating, non-examining physician's opinion, the
administrative law judge may choose whom to credit in
his or her analysis, but "cannot reject evidence for no
reason or for the wrong reason."  <u>Id.</u>  In choosing to
reject the evaluation of a treating physician, an
administrative law judge may not make speculative
inferences from medical reports and may reject treating
physician's opinions outright only on the basis of
contradictory medical evidence. <u>Id.</u>  An administrative
law judge may not reject a written medical opinion of a
treating physician based on his or her own credibility
judgments, speculation or lay opinion. <u>Id.</u>  An
administrative law judge may not disregard the medical
opinion of a treating physician based solely on his or

42

her own "amorphous impressions, gleaned from the record
and from his evaluation of the [claimant]'s
credibility." Id.  As one court has stated, "Judges,
including administrative law judges of the Social
Security Administration, must be careful not to succumb
to the temptation to play doctor" because "lay
intuitions about medical phenomena are often wrong."
Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

        The administrative law judge in rejecting the
opinion of Dr. Teribury and setting the residual
functional capacity of Shedden at a limited range of
light work only relies on his lay analysis of the bare
medical records and his assessment of Shedden's
credibility and his activities of daily living.  He also
placed great weight on the assessment of the non-medical
state agency disability adjudicator.

        Shedden's activities of daily living do not
support the conclusion that he can engage in the
physical exertional requirements of full-time light work
(8 hours per day, 5 days per week) or other similar

schedule. In fact the activities which are sporadic
suggest the opposite.  Sporadic activities have long
been considered by the Court of Appeals for this circuit
as not establishing the ability to work. <u>Smith v.
Califano</u>, 637 F.2d 968, 971-972 (3d Cir. 1981); <u>Wright
v. Sullivan</u>, 900 F.2d 675, 682 (3d Cir. 1990).
Anecdotal evidence of a claimant's sporadic activities
is not a sufficient basis to reject the opinion of a
treating physician. <u>Id.</u>  As this court has noted "the
law does not require a complete restriction from
recreational and other activities as a prerequisite to a
finding of disability." <u>Rieder v. Apfel</u>, 115 F.Supp.2d
496, 504-505 (M.D.Pa. 2000)(Munley, J.).  As for the
issue of  credibility <u>Morales</u> clearly indicates that an
administrative law judge may not reject a written
medical opinion of a treating physician regarding a
claimant's abilities based on his or her assessment of
the claimant's credibility.

    Also, the administrative law judge discounted
the opinions of Dr. Teribury on the basis that he had an

"altruistic and financial interest in aiding" Shedden.
Tr. 26.  The administrative law judge stated that "[i]t
is standard and very common practice for a treating
physician to support and accommodate claimants'
applications for public assistance with the completion
and execution of [disability forms]." Tr. 26.  The
assertion by the administrative law judge that Dr.
Teribury had an "altruistic and financial interest" in
aiding Shedden is pure speculation and is not supported
by any evidence in the record.  There is no evidence in
the record that Dr. Teribury based his opinion regarding
Shedden's inability to engage in any gainful work on
anything other than his best professional judgment.  It
was inappropriate for the administrative law judge to
engage in this type of rationalization.  If allowed to
stand, an administrative law judge could reject treating
physicians' opinions in every case and nullify the
principles set forth by the Court of Appeals for the
Third Circuit in Morales, *supra*.

There is a Residual Functional Capacity
Assessment form in the record. Tr. 175-180.  That form,
however, was completed by a non-medical state agency
disability adjudicator.  This court has repeatedly found
such statements from non-medical disability adjudicators
insufficient evidence of a claimant's residual
functional capacity. See, e.g., Ulrich v. Astrue, Civil
No. 09-803, slip op. at 17-18 (M.D.Pa. Dec. 9,
2009)(Muir, J.); Spancake v. Astrue, Civil No. 10-662,
slip op. at 15 (M.D. Pa. Dec. 23, 2010)(Muir, J.);
Gonzalez v. Astrue, Civil No. 10-839, slip op. at 16
(M.D.Pa. Jan. 11, 2011)(Muir, J.);  Peak v. Astrue,
Civil No. 10-889, slip op. at 25 (M.D.Pa. Jan. 24,
2011)(Muir, J.); see also Dutton v. Astrue, Civil No.
10-2594, slip op. at 22 n. 32(M.D.Pa. Jan. 31,
2012)(Munley, J.)

With respect to the reliance on a form
completed by the state agency disability examiner,
administrative law judges have been instructed to accord
such documents no evidentiary weight.  See Doc. 12,

pages 14-15 in <u>Edwards v. Astrue</u>, Civil No. 10-126
(M.D.Pa. 2010)(quoting a memorandum from the Chief
Administrative Law Judge stating the policy of Social
Security Administration prohibits Administrative Law
Judges from according any weight to forms completed by
the non-medical state agency disability examiners).

      This court has repeatedly recognized that the
residual functional capacity assessment must be based on
a consideration of all the evidence in the record,
including the testimony of a claimant regarding his or
her activities of daily living, medical records, lay
evidence and evidence of pain. <u>See</u> <u>Burnett v. Comm'r of
Soc. Sec. Admin.</u>, 220 F.3d 112, 121-122 (3d Cir. 2000).
However, rarely can a decision be made regarding a
claimant's residual functional capacity without an
assessment from a physician regarding the functional
abilities of the claimant. <u>See</u> <u>Doak v. Heckler</u>, 790 F.2d
26, 29 (3d Cir. 1986)("No physician suggested that the
activity Doak could perform was consistent with the
definition of light work set forth in the regulations,

and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. § 404.1545(a). As two commentators have explained:

> Sometimes administrative law judges assert that they - and not physicians - have the right to make residual functional capacity determinations. In fact, it can reasonably be asserted that the ALJ has the right to determine whether a claimant can engage in sedentary, light, medium, or heavy work. The ALJ should not assume that physicians know the Social Security Administration's definitions of those terms. However, the underlying determination is a medical determination, i.e., that the claimant can lift five, 20, 50, or 100 pounds, and can stand for 30 minutes, two hours, six hours, or eight hours. That determination must be made by a doctor. Once the doctor has determined how long the claimant can sit, stand or walk, and how much weight the claimant can lift and carry, then the ALJ, with the aid of a vocational expert if necessary, can translate that medical determination into a residual functional capacity determination. Of course, in such a situation a residual functional capacity determination is merely a mechanical determination, because the regulations clearly and explicitly define the various types of work that can be performed by

> claimants, based upon their physical
> capacities.

Carolyn A. Kubitschek & Jon C. Dubin, Social Security
Disability Law and Procedure in Federal Courts, 287-88
(2011)(emphasis added); <u>see also</u> <u>Woodford v. Apfel</u>, 93
F.Supp.2d 521, 529 (S.D.N.Y. 2000)("An ALJ commits legal
error when he makes a residual functional capacity
determination based on medical reports that do not
specifically explain the scope of claimant's work-
related capabilities."); <u>Zorilla v. Chater</u>, 915 F.Supp.
662, 667 (S.D.N.Y. 1996)("The lay evaluation of an ALJ
is not sufficient evidence of the claimant's work
capacity; an explanation of the claimant's functional
capacity from a doctor is required.").  The
administrative law judge cannot speculate as to a
claimant's residual functional capacity but must have
medical evidence, and generally a medical opinion
regarding the functional capabilities of the claimant,
supporting his determination. <u>Id.</u>; <u>see also</u> <u>Yanchick v.
Astrue</u>, Civil No. 10-1654, slip op. at 17-19 (M.D.Pa.

April 27, 2011)(Muir, J.)(Doc. 11); <u>Coyne v. Astrue</u>,

Civil No. 10-1203, slip op. at 8-9 (M.D.Pa. June 7,

2011)(Muir,J.)(Doc. 21); <u>Crayton v. Astrue</u>, Civil No.

10-1265, slip op. at 38-39 (M.D.Pa. Sept. 27,

2011)(Caputo, J.)(Doc. 17); <u>Dutton v. Astrue</u>, Civil No.

10-2594, slip op. at 37-39(M.D.Pa. Jan. 31,

2012)(Munley, J.)(Doc. 14); <u>Gunder v. Astrue</u>, Civil No.

11-300, slip op. at 44-46(M.D.Pa. Febr. 15,

2012)(Conaboy, J.)(Doc. 10).[36]

_____

36.  In <u>Gunder</u> Judge Conaboy reconciled the recent case
of <u>Chandler v. Comm'r of Soc. Sec.</u>,
__F.3d.__, 2011 WL 6062067 (3d Cir. Dec. 7. 2011) with
<u>Doak v. Heckler</u>, 790 F.2d 26, 29 (3d Cir.1986).  Judge
Conaboy stated as follows:

> Any argument from the Commissioner
> that his administrative law judges can
> set the residual function capacity in
> the absence of medical opinion or
> evidence must be rejected in light of
> <u>Doak</u>.  Furthermore, any statement in
> <u>Chandler</u> which conflicts (or arguably
> conflicts) with <u>Doak</u> is *dicta* and must
> be disregarded. <u>Government of Virgin
> Islands v. Mills</u>, 634 F.3d 746, 750
> (3d Cir. 2011)(a three member panel of
> the Court of Appeals cannot set aside
> or overrule a precedential opinion of
> a prior three member panel).

(continued...)

Finally, the administrative law judge failed to appropriately develop the record in this case. It is clear that the record was insufficiently developed for the administrative law judge to make a determination regarding the physical exertional abilities of Shedden and the issue of disability.  One glaring problem is the illegibility of many of Dr. Teribury's treatment notes. Because there was no assessment regarding the exertional abilities of Shedden from a treating or evaluating physician and the bare medical records were insufficient for an administrative law judge to make such a determination, it was incumbent upon the administrative law judge to obtain such an assessment.[37]  It is clear

_____

36.  (...continued)
Slip op. at 45-46.

37.  The Social Security regulations support the concept that when the evidence is insufficient to make a determination regarding disability, the administrative law judge must take steps to further develop the record. See 20 C.F.R. §  416.919a(b)("Situations requiring a consultative examination."). In this case, the opinion of Dr. Teribury supported a finding of disability and if the administrative law judge doubted that opinion he had the obligation to further develop
(continued...)

that such an assessment could have been obtained by recontacting Dr. Teribury. Tr. 253-260.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence.

An appropriate order will be issued.

                              s/Sylvia H. Rambo
                         United States District Judge

Dated:  March 7, 2012.

---

37.  (...continued)
the record. Id.  He could not rely on the opinion of the non-medical social security disability adjudicator.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KENNETH D. SHEDDEN,       :
                        :
       Plaintiff      :    CIVIL NO. 4:10-CV-2515
                        :
   vs.               :
                        :
MICHAEL J. ASTRUE,      :
COMMISSIONER OF SOCIAL  :    (Judge Rambo)
SECURITY,            :
                        :
      Defendant      :

## ORDER AND JUDGMENT

     In accordance with the accompanying memorandum,

**IT IS HEREBY ORDERED THAT:**

     1.  The Clerk of Court shall enter judgment in favor of Kenneth D. Shedden and against the Commissioner of Social Security as set forth in the following paragraph.

1

2.   The decision of the Commissioner of Social Security denying Kenneth D. Shedden supplemental security income benefits is vacated and the case remanded to the Commissioner of Social Security to:

2.1 Conduct a new administrative hearing and appropriately evaluate the medical evidence and the credibility of Kenneth D. Shedden in accordance with the background of this order.

3.   The Clerk of Court shall close this case.


                                   s/Sylvia H. Rambo
                                   United States District Judge

Dated:  March 7, 2012.

2